**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Wilfredo Martinez Jr., *on his own behalf and on behalf of all others similarly situated,* | ) | |
| | ) | Case No. 23-cv-1637 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Chicago Transit Authority, | ) | |
| | ) | |
| Defendant. | ) | |

## Class Action Complaint

For his complaint against Defendant Chicago Transit Authority (the "CTA"), Wilfredo Martinez Jr. ("Martinez"), on his own behalf and on behalf of all others similarly situated, states as follows:

### Parties

1. Plaintiff Martinez is a former CTA bus operator.

2. Defendant CTA is an independent governmental agency which operates in Chicago and 35 surrounding suburbs and is the nation's second largest public transportation system.

### Jurisdiction and Venue

3. This action arises under the laws of the United States—specifically, the First and Fourteenth Amendments to the United States Constitution.[1]

4. This action also arises under the laws of the State of Illinois—specifically, the Illinois Religious Freedom Restoration Act, 775 ILCS 35, *et seq.*, and the Illinois Health Care Right of Conscience Act, 745 ILCS 70, *et seq.*

[1] Martinez intends to seek leave to amend his Complaint to add Title VII (and Illinois Human Rights Act) claims after he has exhausted his administrative remedies.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)(2) because the CTA is headquartered in the Northern District of Illinois and a substantial part of the events or omissions giving rise to Martinez's claims occurred in this District.

7. This Court is authorized to grant a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

**Facts**

8. Martinez is a former CTA Bus Operator.

9. At all relevant times during his employment with the CTA, Martinez was a dedicated employee who met or exceeded the CTA's legitimate employment expectations.

10. Beginning in late 2019 and early 2020, a global outbreak of a virus now referred to as COVID-19 emerged.

11. COVID-19 was officially declared a pandemic by the World Health Organization in March 2020.

12. At that time, great efforts were made by the public and private sector alike to develop a vaccine.

13. To combat the spread of the virus, public health experts opined that the public should practice social distancing, wear masks, and isolate if showing symptoms of COVID-19. Employers across the country began requiring employees to practice these measures—and many began permitting remote work.

14. The U.S. Food and Drug Administration eventually granted Emergency Use Authorization for a COVID-19 vaccine, the Pfizer-BioNTech vaccine, on December 11, 2020. The

Moderna vaccine was granted Emergency Use Authorization on December 18, 2020. The Johnson & Johnson vaccine was granted Emergency Use Authorization on February 27, 2021.

15. With vaccines available to the general public, employers began to mandate that employees get vaccinated, or else suffer adverse employment actions, such as being placed on unpaid leave or being terminated.

16. The CTA did not initially require that employees obtain a COVID-19 vaccine. Throughout most of the pandemic, the CTA allowed its employees to continue working by encouraging safety measures, such as masking and social distancing.

17. Martinez, like many other CTA employees, continued to work throughout the pandemic, was viewed as essential worker, and was eventually proclaimed as one of the "unsung heroes of the pandemic" by CTA President Dorval R. Carter Jr. ("Carter Jr.").

18. The lack of a vaccine mandate throughout most of the pandemic did not cause the CTA any undue hardship.

19. On September 3, 2021, approximately 10 months after the first vaccine was authorized, the CTA announced that all CTA employees were required to be fully vaccinated against COVID-19.

20. At that time, Carter Jr. proclaimed that employees had to be vaccinated in order to "help fight off these variants and protect our loved ones and others who cannot be vaccinated."

21. Carter Jr. made that proclamation even though the COVID-19 vaccines were not tested, designed, or made to prevent transmission of COVID-19.

22. The mandatory COVID-19 Vaccination Policy also did not take into account the fact that individuals who recover from COVID-19 develop antibodies or natural immunity; nor did it take into account the efficacy of alternative measures such as face coverings, personal protective equipment, self-monitoring and reporting of symptoms, and/or periodic testing.

23. The CTA's mandatory COVID-19 Vaccination Policy was at odds with the Federal government's policy allowing certain large employers to mandate vaccination *or* periodic testing for their employees.

24. The CTA's mandatory COVID-19 Vaccination Policy also differed substantially from the European Union's digital COVID-19 certificate, which considered the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.

25. The CTA has claimed, and still claims, to offer religious exemptions/ accommodations, stating on their "Careers" website the following:

> The CTA complies with all federal and state laws forbidding discrimination and will attempt to provide a reasonable accommodation to otherwise qualified individuals to enable them to perform the essential functions of the job. CTA will make reasonable accommodations for the known disabilities of otherwise qualified applicants for employment as well as its employees, unless undue hardship would result. . . . CTA will work with you to determine if an accommodation can be provided…
>
> If you are an applicant requesting a COVID-19 vaccine religious accommodation or other, please email the Equal Employment Opportunity Unit at EEODiversity@transitchicago.com.

26. In order to obtain a religious exemption/accommodation related to the mandatory COVID-19 Vaccination Policy, CTA employees were and are required to complete a "Request For Religious Exemption/Accommodation Related to COVID-19 Vaccine."

27. After the CTA announced its employee vaccination policy, Martinez completed and submitted a request for a religious exemption/accommodation.

28. On November 1, 2021, the CTA confirmed receipt of Martinez's request and asked him to provide additional information within 7 days.

29. On November 7, 2021, in response to the CTA's request for additional information, Martinez wrote, "I respectfully request an exemption from the COVID-19 vaccination requirement as it violates my sincerely held religious beliefs, practice, and observance… my body is the temple of

the Holy Spirit… taking the vaccine is an affront to me… I have a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion during any stage of the vaccine's development, including the testing phase of development of a medical product… my beliefs regarding the sanctity of human life conflicts directly with any requirement to inject abortion-tainted vaccination into my body… as a Christian, it is my duty to bear witness to the world by not accepting theses vaccines and medicines." Martinez cited two Bible verses in support of his beliefs.

30. In response to the CTA's request for additional information, Martinez also informed the CTA that he would, as an accommodation, agree to be tested weekly for COVID-19 and wear a mask when on CTA property.

31. Martinez's sincerely held religious beliefs, rooted in scripture and religious teachings, precluded (and still preclude) him from accepting into his body a COVID-19 vaccine, in part because these vaccines were derived from, produced, manufactured by, tested on, developed with, have their origins in research on, or are otherwise connected to aborted fetal cell lines.

32. Martinez continued to hold true to his beliefs and continued to refuse (and to this day has refused) to obtain a COVID-19 vaccine.

33. Despite the CTA's insistence that every employee had to be vaccinated against COVID-19 in order to work for the CTA, the CTA allowed Martinez to continue working while unvaccinated until approximately September of 2022.

34. In or around September of 2022, the CTA met with Martinez about his failure to become vaccinated against COVID-19.

35. During that meeting, the CTA informed Martinez that his exemption/accommodation request had been denied, that he was going to be removed from service and given 5 weeks (without pay) to become vaccinated against COVID-19, and that he would be

terminated at the end of those 5 weeks (if he was still unvaccinated at that time). At the time this meeting occurred, the CTA knew that Martinez had previously contracted and recovered from COVID-19 (and thus had developed antibodies/natural immunity).

36. Martinez, who could not and cannot receive a COVID-19 vaccine due to his religious beliefs, chose to resign that day, rather than wait 5 weeks (without pay) to be terminated. This decision was forced by the CTA—Martinez's options were to: 1) resign; or 2) take 5 weeks of unpaid leave and then be terminated anyway.

37. Upon information and belief, the CTA has never required the public to get vaccinated in order to utilize its public transportation services.

38. Upon information and belief, the CTA has never required its employees to obtain vaccine boosters.

39. Upon information and belief, the CTA has allowed other employees to continue working even though they are not vaccinated against COVID-19 and have not been granted exemptions/accommodations related to the policy.

40. Upon information and belief, the CTA has granted exemptions/allowed accommodations for other employees, due to their religious beliefs, and has allowed them to continue working even though they are not vaccinated against COVID-19.

41. As a result of the CTA's actions, Martinez and hundreds of other similarly situated employees have sustained damages including, but not limited to, lost income, lost bonuses, lost insurance, lost company benefits, and emotional distress.

**Class Allegations**

42. Through this action, Martinez seeks to represent a class of all CTA employees who 1) have requested or will request religious exemptions/accommodations related to the mandatory COVID-19 Vaccination Policy and 2) who have had those requests denied.

43. Martinez brings this class action under Federal Rules of Civil Procedure 23(a) and (b).

44. The class is so numerous that joinder of all members is impractical. Based on FOIA information obtained by counsel, the exact class size appears to be 530+.

45. There are questions of law and fact common to all members of the class. Those common questions presently include, but are not limited to, the following:

a. Did the CTA comply with federal and state law when it denied religious exemption and accommodation requests to the vast majority (~93%) of those who applied?

b. Whether the CTA properly reviewed and analyzed the religious exemption and accommodation requests;

c. Whether the CTA properly concluded that it could not accommodate the vast majority of those who applied for religious exemptions;

d. Whether the CTA improperly questioned the validity of employees' religious beliefs;

e. Whether the process itself, which led to a ~93% denial rate, was a sham;

f. Whether the CTA violated federal and state law when it granted some religious exemption requests, and provided for some reasonable accommodations, even while denying Martinez's similar requests;

g. Whether the CTA exhibited bias against exemptions in favor of an agenda to increase vaccination rates; and

h. Whether the CTA properly concluded that unvaccinated employees posed a risk to other employees or the public.

46. Martinez's claims are typical of the claims of the proposed class because he, like the proposed class members, requested a religious exemption/accommodation related to the mandatory COVID-19 Vaccination Policy, and the CTA denied their requests.

47. For the same reason, Martinez will fairly and adequately protect the interests of the class.

48. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Martinez's claims. Joinder of all members is impracticable.

**COUNT I – VIOLATION OF THE FIRST AMENDMENT FREE EXERCISE CLAUSE**

49. Martinez hereby realleges and adopts each and every allegation in paragraphs 1-48 as if fully set forth herein.

50. The Free Exercise Clause of the First Amendment to the United States Constitution (made applicable to the states by the Fourteenth Amendment) provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…" U.S. CONST. amend. I.

51. The CTA's mandatory vaccine policy substantially burdened Martinez's free exercise of religion by unlawfully conditioning his employment on Martinez abandoning his religious beliefs.

52. The CTA's mandatory vaccine policy was not neutral and generally applicable as the CTA granted some religious exemption/accommodation requests, but denied a similar request made by Martinez.

53. The CTA engaged in a process of individualized assessments/exemptions when it reviewed requests for religious exemptions/accommodations.

54. Martinez' forced resignation cannot be justified by a compelling governmental interest and was not narrowly tailored to advance any such interest.

WHEREFORE, Martinez respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

## COUNT II – VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION

55. Martinez hereby realleges and adopts each and every allegation in paragraphs 1-48 as if fully set forth herein.

56. The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons alike.

57. The CTA has violated Martinez's right to equal protection by granting religious exemption/accommodation requests to some similarly situated employees but denying the same to him.

58. The CTA has violated Martinez's right to equal protection by continuing to employ certain bus operators that are not vaccinated, but refusing to continue to employ Martinez on an equal basis.

59. Under the Equal Protection Clause, government actions and laws which burden a fundamental right and treat persons unequally based on an inherently suspect classification are subject to strict scrutiny.

60. The CTA cannot satisfy strict scrutiny.

WHEREFORE, Martinez respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

## COUNT III – VIOLATION OF THE ILLINOIS HEALTH CARE RIGHT OF CONSCIENCE ACT, 745 ILCS 70

61. Martinez hereby realleges and adopts each and every allegation in paragraphs 1-48 as if fully set forth herein.

62. The Illinois Health Care Right of Conscience Act (the "Act") protects Martinez's rights to engage in the exercise of his sincerely held religious beliefs without fear of discrimination from any entity, whether public or private, including the CTA.

63. In fact, the State of Illinois has declared it to be the public policy of the State to protect the religious conscience rights of all individuals in the State of Illinois as it relates to health care services. The Illinois Health Care Right of Conscience Act provides, specifically:

> The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care**. It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care.

745 ILCS 70/2 (emphasis added).

64. In furtherance of the State of Illinois public policy of protecting the religious conscience rights of all Illinoisans to exercise their sincere religious convictions in their medical decision-making, the Illinois Health Care Right of Conscience Act states:

> **It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added).

65. The Illinois Health Care Right of Conscience Act further provides:

> **It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation**

> **thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

745 ILCS 70/7 (emphasis added).

66. The Illinois Health Care Right of Conscience Act defines "Health care" broadly to include vaccinations. Specifically, it provides that "Health Care":

> means **any phase** of patient care, including but not limited to, **testing**; diagnosis; **prognosis**; ancillary research; **instructions**; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; **medication**; surgery or **other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility**, **intended** for the **physical**, emotional, and mental well-being of persons.

745 ILCS 70/3 (a) (emphasis added).

67. The Illinois Health Care Right of Conscience Act defines "Conscience," as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

68. A violation of the Illinois Health Care Right of Conscience Act provides for the following remedies:

> **Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor, and shall recover threefold the actual damages, including pain and suffering, sustained by such person, association, corporation, entity or health care facility, the costs of the suit and reasonable attorney's fees; but in no case shall recovery be less than $2,500 for each violation in addition to costs of the suit and reasonable attorney's fees. These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law**.

745 ILCS 70/12 (emphasis added).

69. The Illinois Health Care Right of Conscience Act acts as a super statute in Illinois, preempting and superseding all other acts and portions of acts that conflict with the explicit policies contained in the statute.

70. Specifically, the Illinois Health Care Right of Conscience Act states: "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

71. Even as a public institution, the CTA is subject to the provisions of the Illinois Health Care Right of Conscience Act. The CTA is therefore prohibited from discriminating against Martinez for his refusal to accept one of the vaccines on account of his sincerely held religious beliefs.

72. Martinez's sincerely held religious beliefs, which were articulated to the CTA, constitutes Martinez's "conscience" under the Act because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

73. The COVID-19 vaccines constitute "Health care" under the Act because they are a "phase of patient care," "medication," and "other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons." 745 ILCS 70/3(a).

74. The Act does not provide any defense to discriminate against Martinez based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43.

75. By imposing its mandatory COVID-19 Vaccination Policy upon Martinez and refusing to grant him a religious exemption from/accommodation related to the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly, unlawfully, and unconscionably discriminated against Martinez because of his conscientious refusal to receive or accept a COVID-19 vaccine in contradiction to his rights of conscience and sincerely held religious beliefs.

76. By forcing Martinez to resign or be terminated for his failure to comply with the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly discriminated against Martinez on account of his sincerely held religious objections to receiving or accepting a COVID-19 vaccine in violation of 745 ILCS 70/5.

77. The mandatory COVID-19 Vaccination Policy, as applied, is a gross violation of Martinez's sincerely held beliefs—and of his right of conscience under the Illinois Health Care Right of Conscience Act.

78. The mandatory COVID-19 Vaccination Policy, as applied, is an impermissible discrimination against Martinez on the basis of his sincerely held religious beliefs, and in violation of Martinez's rights of conscience under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Martinez respectfully prays for relief against the CTA as set forth in his Prayer for Relief set out below.

**COUNT IV – VIOLATION OF THE ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT**

79. Martinez hereby realleges and adopts each and every allegation in paragraphs 1-48 as if fully set forth herein.

80. The Illinois Religious Freedom Restoration Act provides:

> "Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest."

(775 ILCS 35).

81. The CTA's mandatory vaccine policy substantially burdened Martinez's exercise of religion by conditioning his employment on Martinez abandoning his religious beliefs.

82. The CTA cannot meet its burden of demonstrating that forcing Martinez to resign or be terminated for his failure to become vaccinated against COVID-19—or its similar conduct

against others similarly situated—was in furtherance of a compelling governmental interest and that it was the least restrictive means of furthering that interest.

WHEREFORE, Martinez respectfully prays for relief against the CTA as set forth in his Prayer for Relief set out below.

**Jury Demand**

Martinez demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**Prayer for Relief**

WHEREFORE, Martinez respectfully prays for relief as follows:

1. That the Court certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b);

2. That this Court render a Declaratory Judgment declaring that the CTA's mandatory COVID-19 Vaccination Policy, as applied by the CTA, is illegal and unlawful under: the Free Exercise Clause of the First Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Illinois Religious Freedom Restoration Act; and the Illinois Health Care Right of Conscience Act, 745 ILCS 70/5 and 745 ILCS 70/7—and further declaring that: by forcing Martinez to resign or be terminated for his failure to become vaccinated against COVID-19 (and engaging in similar conduct against others similarly situated), the CTA has unlawfully discriminated against Martinez, and others similarly situated, on account of sincerely held religious objections to receiving or accepting a COVID-19 vaccine;

3. That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

4. That this Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

5. That the CTA be found liable, that judgment be entered against it, and that Martinez, as well as all those similarly situated, be awarded all remedies to which they may be entitled under the law, including:

a. back pay, including lost benefits;
b. front pay, including benefits (or reinstatement);
c. compensatory damages, including for emotional distress;
d. actual damages in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILCS 70/12);
e. treble actual damages, including those for emotional distress and pain and suffering, as provided by 745 ILCS 70/12;
f. nominal damages;
g. reasonable costs and expenses of this action, including reasonable attorneys' fees and expert fees; and
h. such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully Submitted by,

/s/ Julie Herrera
/s/ Steve Molitor

Law Office of Julie O. Herrera
159 N. Sangamon St., Ste. 200
Chicago, IL 60607
312-479-3014 (Phone)
708-843-5802 (Fax)
jherrera@julieherreralaw.com
smolitor@julieherreralaw.com

/s/ Sorin A. Leahu

Leahu Law Group, LLC
53 W. Jackson Blvd, Suite 1527
Chicago, IL 60604
Telephone: (847)-529-7221
sleahu@leahulaw.com